**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MARCH 16, 2023

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MARCH 16, 2023

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 100135-5 |
| Respondent, | ) | |
| v. | ) | En Banc |
| ZACHERY KYLE MEREDITH, | ) | |
| Petitioner. | ) | Filed: March 16, 2023 |

YU, J. — This case concerns a particular method of fare enforcement that has been used on some barrier-free transit systems and is conducted by law enforcement officers rather than civilian fare enforcement officers. Many transit systems have already discontinued similar practices due to their known, racially disproportionate impact.[1] We must now decide whether this fare enforcement method, as used in this case, disturbed the private affairs of transit passenger

---

[1] *See* Amicus Br. of Sound Transit, Cmty. Transit, King County Metro & Wash. State. Transit Ass'n at 10-12; Br. of Amici Curiae ACLU (Am. C.L. Union) of Wash., Wash. Def. Ass'n & King County Dep't of Pub. Def. at 22-25.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Zachery Kyle Meredith*, No. 100135-5

Zachery Meredith for purposes of article I, section 7 of the Washington

Constitution.

Barrier-free transit systems must, and do, have the authority to ensure that

passengers pay their fares.  At the same time, transit passengers must not be

"disturbed in [their] private affairs . . . without authority of law."  CONST. art. I,

§ 7.  The authority of transit systems and the rights of transit passengers need not

conflict.  However, striking the proper balance requires careful attention to the way

in which fare enforcement is conducted.

Based on the totality of the circumstances presented, a majority of this court

holds that Meredith was unlawfully seized.  Concurrence (Madsen, J.) at 1;

concurrence (Fearing, J. Pro Tem.) at 11.  The resulting evidence must be

suppressed.  Thus, we reverse the Court of Appeals and remand to the trial court

for further proceedings.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A.    Factual background

On March 28, 2018, Meredith boarded a "Swift Blue Line" bus in

Snohomish County.  Clerk's Papers (CP) at 79.  The Swift Blue Line is a service of

Community Transit, which provides public transportation in the Puget Sound

region.  *About Us*, CMTY. TRANSIT, https://www.communitytransit.org/about/

about-us (last visited Mar. 6, 2023).  Like many other rapid bus lines around the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

state, Swift buses use a "barrier-free payment-system[ ]." Amicus Br. of Sound Transit, Cmty. Transit, King County Metro & Wash. State. Transit Ass'n at 4-5. In this system, passengers pay up front and are not required to pass through "turnstiles, gates, or other barriers" before boarding their bus. *Id.* at 4. When riding the Swift Blue Line, passengers can "[b]oard through one of the three doors" on the bus, and the bus will "stop for about 10 seconds at each station." *How to Ride Swift*, CMTY. TRANSIT, https://www.communitytransit.org/swift/how-to-ride-swift (last visited Mar. 6, 2023).

Snohomish County Sheriff's Deputy Thomas Dalton and his partner were also on the Swift Blue Line that day, conducting fare enforcement pursuant to RCW 36.57A.235. In addition to the two deputies, Sergeant Louis Zelaya was "in his patrol car, following [the bus] and acting as the back-up officer." CP at 67. All three police officers were "fully outfitted in [their] patrol uniforms," and Deputy Dalton, at least, was armed. *Id.* at 212 (deputies were in uniform)*; see also id.* at 236 (sergeant was in uniform), 96 (Deputy Dalton did not "ever draw [his] weapon").

Deputy Dalton and his partner boarded Meredith's bus "at around 11:15 a.m." to conduct "a special op on fare enforcement." *Id.* at 90-91. Meredith was "already on the bus" at the time, and Deputy Dalton "never observed him getting on the bus without paying," either in person or on video. *Id.* at 104. As "the bus

[was] moving towards the next stop," the deputies "approached everybody" and "asked for proof of payment or an ORCA[2] card," working "from the back to the front." *Id.* at 107, 106.

In accordance with his "general practice," Deputy Dalton requested "'proof of payment or ORCA card'" from each passenger on the bus. *Id.* at 106. On this particular day, the deputies "contacted three people for failing to provide proof of payment." *Id.* at 92. Consistent with their usual procedure, the deputies notified Sergeant Zelaya by radio "that [they] were going to get off at the next bus [stop] and deal with the three people at the next platform." *Id.*

Meredith was one of the individuals who "was not able to present proof of fare payment," so "[u]pon reaching the next stop, Deputy Dalton detained [Meredith] outside at the bus platform." *Id.* at 67. The deputy's "standard practice [was] to determine the history of transit violations" and, to do so, he asked Meredith "to identify himself." *Id.* at 67-68. Meredith "did not possess any identification documents," but he gave the deputy a name and birth date, which turned out to be false. *Id.* at 68. The deputy ran this information twice, "but he did

---

[2] The trial court found that "[a]lthough there was no direct testimony on what is an 'Orca card,' the court makes a reasonable inference from the testimony presented that an Orca card is a fare payment card." CP at 67.

not get any results on any person." *Id.* "After the second attempt, the deputy handcuffed [Meredith]" but "did not advise [him] of the *Miranda*[3] warnings." *Id.*

"By this time, the Sergeant had arrived to the scene." *Id.* Sergeant Zelaya had with him a "portable biometric fingerprint reader" called "Mobile ID," which "allows [officers] to scan the index finger of an individual and that information is sent via a program to AFIS [(Automated Fingerprint Identification System)] King County, Washington State Patrol, and the FBI [(Federal Bureau of Investigation)]." *Id.* at 81. At the time, the Mobile ID device had been recently acquired by the Snohomish County Sheriff's Office "through a pilot program" and was being used when officers had "probable cause already for someone's arrest" but "were unable to identify them through other means." *Id.* at 84.

Because Deputy Dalton did not yet know Meredith's identity, he had no way of knowing whether Meredith had "[f]ail[ed] to pay the required fare on more than one occasion within a twelve-month period." RCW 36.57A.240(1); *see also* concurrence (Fearing, J. Pro Tem.) at 8. Nevertheless, rather than issuing a "civil infraction[ ]" for Meredith's failure to provide proof of payment, the deputy "believed he had probable cause to arrest [Meredith] for theft in the third degree." RCW 36.57A.230(2); CP at 67; *see also* concurrence (Fearing, J. Pro Tem.) at 6-8.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

5

For that reason, the officers used the Mobile ID device to take Meredith's fingerprints while he was handcuffed. CP at 102.

One of the three databases accessed through the Mobile ID "yielded the defendant's name of Zachery Meredith, his date of birth, and the defendant's photograph." *Id.* at 68. Sergeant Zelaya then ran Meredith's information through a fourth "database used by the Snohomish County Sheriff's office," which showed that Meredith "had two arrest warrants." *Id.* at 69. Meredith was arrested and transported to jail.

B.    Procedural history

The State charged Meredith in Snohomish County District Court with a gross misdemeanor for making "a false or misleading material statement to a public servant" in violation of RCW 9A.76.175. *Id.* at 280. Meredith filed a pretrial motion to suppress, contending that he "was unlawfully seized when he was contacted by the Deputy and ordered off the bus, as the deputy lacked reasonable suspicion that a crime had been committed." *Id.* at 313. The district court denied the motion to suppress, and Meredith was convicted following a jury trial. He was sentenced to 58 days in jail, which he had already served. *Id.* at 276.

Meredith appealed his conviction to the Snohomish County Superior Court, which affirmed. *Id.* at 3-6. The Court of Appeals, Division One, granted Meredith's motion for discretionary review "on the constitutionality of RCW

6

*State v. Zachery Kyle Meredith*, No. 100135-5

[36.57A.235[4]] related to Deputy Dalton's initial contact (request for proof of fare payment or O[RCA] card)," and affirmed in a published opinion. Ruling Granting Rev., *State v. Meredith*, No. 81203-3-I, at 5 (Wash. Ct. App. May 18, 2020). The court assumed, without deciding, that Meredith had been seized, but determined that Meredith consented based on the "contractual relationship [that] forms between the operator of a bus and a person choosing to ride it." *State v. Meredith,* 18 Wn. App. 2d 499, 510, 492 P.3d 198 (2021).

We granted Meredith's petition for review and accepted for filing two amici briefs on the merits. One brief was jointly filed by the American Civil Liberties Union of Washington, the Washington Defender Association, and the King County Department of Public Defense, and the other was jointly filed by Sound Transit, Community Transit, King County Metro, and the Washington State Transit Association.

We must determine whether Meredith was disturbed in his private affairs by the particular method of fare enforcement used here and, if so, whether this disturbance complied with article I, section 7.

---

[4] Prior to reaching this court, the parties and courts involved in this case cited statutes from chapter 81.112 RCW. *E.g.*, CP at 69; *State v. Meredith,* 18 Wn. App. 2d 499, 503, 492 P.3d 198 (2021). For the first time in its supplemental brief, the State correctly points out that in fact, "Community Transit (which operates the Swift system) is a Public Benefit Transit Area (PTBA) governed by ch. 36.57A RCW." Suppl. Br. of Resp't at 20; *see also About Us*, CMTY. TRANSIT, https://www.communitytransit.org/about/about-us (last visited Mar. 6, 2023). However, the language of the relevant statutes is largely identical, and this corrected citation does not affect our analysis.

*State v. Zachery Kyle Meredith*, No. 100135-5

## ISSUES

A.      Did the method of fare enforcement used in this case result in a disturbance of Meredith's private affairs?

B.      If Meredith was disturbed in his private affairs, was the disturbance lawfully justified by RCW 36.57A.235?

C.      If the disturbance of Meredith's private affairs was not lawfully justified by RCW 36.57A.235, was there other lawful justification?

## ANALYSIS

We are presented with a narrow, as-applied challenge to the particular method of fare enforcement used in this case. Meredith contends Deputy Dalton's actions "unconstitutionally disturbed [his] right to privacy" in violation of article I, section 7 of the Washington Constitution.[5] Suppl. Br. of Pet'r at 6. Article I, section 7 "protects against unwarranted government intrusions into private affairs." *State v. Doughty*, 170 Wn.2d 57, 61, 239 P.3d 573 (2010). The seizure of a person

---

[5] Meredith's briefing focuses on article I, section 7, which "provides greater protection to individual privacy interests than the Fourth Amendment" to the federal constitution. *City of Seattle v. Mesiani*, 110 Wn.2d 454, 456, 755 P.2d 775 (1988) (citing *State v. Gunwall*, 106 Wn.2d 54, 65, 720 P.2d 808 (1986)). To the extent Meredith makes a separate claim based on the Fourth Amendment, we decline to reach it because it is unnecessary to our resolution of this case. Likewise, we decline to reach Meredith's contention that "'the government may not grant a benefit on the condition that the beneficiary surrender a constitutional right, even if the government may withhold that benefit altogether.'" Suppl. Br. of Pet'r at 19 (quoting *Butler v. Kato*, 137 Wn. App. 515, 530, 154 P.3d 259 (2007)).

8

by a police officer represents such an intrusion and must be supported by a warrant, subject only to "narrow exception[s]." *Id.*

Thus, to resolve Meredith's claim, "we must first determine whether a warrantless . . . seizure has taken place and, if it has, whether the action was justified by an exception to the warrant requirement." *State v. Rankin*, 151 Wn.2d 689, 695, 92 P.3d 202 (2004). The findings of fact entered by the district court are unchallenged and are therefore "verities on appeal." *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). We review "conclusions of law from an order pertaining to the suppression of evidence de novo." *State v. Duncan,* 146 Wn.2d 166, 171, 43 P.3d 513 (2002).

A.     Under the facts presented here, Meredith was disturbed in his private affairs

As noted above, the Court of Appeals "assume[d] without deciding" that Meredith was disturbed in his private affairs in this case. *Meredith,* 18 Wn. App. 2d at 506. However, the State and dissent strongly dispute this assumption, so we address this issue on the merits. Based on the record in this case, and in accordance with well-established principles of Washington law, a majority of this court holds that Meredith was disturbed in his private affairs under the circumstances presented. Four justices would hold that Deputy Dalton seized Meredith when the deputy, "while armed and wearing full uniform and while the bus moved, approached Meredith and demanded to see proof of payment."

*State v. Zachery Kyle Meredith*, No. 100135-5

Concurrence (Fearing, J. Pro Tem.) at 11. One justice would hold that "Meredith was seized when he was detained after being removed from the bus." Concurrence (Madsen, J.) at 1.

When considering an alleged disturbance of private affairs, such as a seizure, we are mindful that "'[n]ot every encounter between a police officer and a citizen is an intrusion requiring an objective justification.'" *Rankin*, 151 Wn.2d at 695 (alteration in original) (quoting *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980) (plurality portion)). We do not seek to "'impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices,'" nor do we challenge "'the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws.'" *O'Neill*, 148 Wn.2d at 575 (internal quotation marks omitted) (quoting *State v. Young*, 135 Wn.2d 498, 511, 957 P.2d 681 (1998); *Mendenhall*, 446 U.S. at 554 (plurality portion)). However, "*if* a police officer's conduct or show of authority, objectively viewed, rises to the level of a seizure," then article I, section 7 requires lawful justification. *Id.* at 576.

A seizure occurs only "'when, in view of all the circumstances surrounding the incident, a reasonable person would have believed [they were] not free to leave'" or "free to otherwise decline an officer's request and terminate the encounter" due to an officer's use of "'physical force or a show of authority.'"

10

*Young*, 135 Wn.2d at 510 (quoting *State v. Stroud*, 30 Wn. App. 392, 394-95, 634

P.2d 316 (1981), *review denied*, 96 Wn.2d 1025 (1982)); *O'Neill*, 148 Wn.2d at

574 (internal quotation marks omitted) (quoting *Young*, 135 Wn.2d at 510); *see*

*also Mendenhall*, 446 U.S. at 554 (plurality portion); *State v. Sum*, 199 Wn.2d 627,

653, 644, 511 P.3d 92 (2022).

This test "is a purely objective one, looking to the actions of the law

enforcement officer." *Young*, 135 Wn.2d at 501 (rejecting the subjective test from

*California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)).

There is nothing in the record to suggest that Deputy Dalton used physical force to

restrain Meredith before removing him from the bus. Therefore, the question is

whether Deputy Dalton's request for proof of payment was accompanied by a

"display of authority," such that a reasonable person "would not believe" they were

free to "decline [the] request." *Rankin*, 151 Wn.2d at 695.

When assessing an officer's show of authority for purposes of article I,

section 7, we have often looked to the illustrative examples provided by the United

States Supreme Court's decision in *Mendenhall*, such as "the threatening presence

of several officers, the display of a weapon by an officer, some physical touching

of the person of the citizen, or the use of language or tone of voice indicating that

compliance with the officer's request might be compelled." 446 U.S. at 554

(plurality portion). *See, e.g.*, *Rankin*, 151 Wn.2d at 695; *O'Neill*, 148 Wn.2d at

11

*State v. Zachery Kyle Meredith*, No. 100135-5

581; *Young*, 135 Wn.2d at 512.  These examples helpfully guide our analysis, although we must consider "all [of] the circumstances" presented by each case. *O'Neill*, 148 Wn.2d at 574.

The circumstances presented here must begin with the location in which the encounter occurred.  Meredith was on a moving bus when Deputy Dalton requested his proof of fare payment.  It is correctly undisputed that "passengers could not leave the bus while it was traveling between stops."  Suppl. Br. of Resp't at 15.  We may assume that passengers were not prevented from getting off the bus at designated stops, but Meredith did not have that option.  The record shows that Meredith was contacted by Deputy Dalton shortly after the deputy boarded, "before [they] reached the next stop."  CP at 92.  Meredith had no reasonable opportunity to exit the bus in order to avoid speaking with the deputy during the brief period that the bus remained at the stop after the deputy boarded.  *See How to Ride Swift*, *supra* ("Swift buses stop for about 10 seconds at each station.").

The State, relying on federal authority, contends that Meredith's inability to get off the bus "'says nothing about whether or not the police conduct at issue was coercive.'"  Suppl. Br. of Resp't at 15 (quoting *Florida v. Bostick*, 501 U.S. 426, 435-36, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)).  Similarly, the dissent views the fact that "the Swift bus was moving between stops when the encounter took place" as a "distract[ion]."  Dissent at 11.  However, we must consider "the

*State v. Zachery Kyle Meredith*, No. 100135-5

circumstances" of an alleged disturbance of private affairs, and we cannot do so

without considering the location in which it occurred. *O'Neill*, 148 Wn.2d at 574.

For instance, in *State v. Carriero*, the Court of Appeals properly considered

the fact that "Yakima Police Department patrol cars blocked the exit of Otoniel

Carriero's [vehicle]" in holding that a seizure occurred under the circumstances

presented. 8 Wn. App. 2d 641, 659, 439 P.3d 679 (2019); *see also Dozier v.*

*United States*, 220 A.3d 933, 941 (D.C. 2019) (among other factors, defendant's

location "in a secluded alley" is relevant to Fourth Amendment to the United States

Constitution seizure inquiry). Here, Meredith was contacted by law enforcement

in a setting where he could not physically leave.[6] The location of this contact was

not a coincidence; it was established by the deputy's "conduct itself." *Contra*

dissent at 11. This fact alone does not show Meredith was seized, but it weighs in

favor of such a determination.

In addition, when Deputy Dalton contacted Meredith, the deputy was not

alone; his partner was working on the same bus, both were fully uniformed, and at

---

[6] For this reason, the dissent's reliance on *United States v. Drayton* is misplaced. *See* dissent at 11 (citing 536 U.S. 194, 204, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002)). In that case, police officers boarded a bus *while it was stopped*, "asked the passengers about their travel plans and sought to match passengers with luggage in the overhead racks." *Drayton*, 536 U.S. at 198. The aisle was not blocked, and, "[a]ccording to [the officer]'s testimony, passengers who declined to cooperate with him or who chose to exit the bus at any time would have been allowed to do so without argument." *Id.*; *cf. Bostick*, 501 U.S. at 435 (police encounter when "the bus was *about to depart*" (emphasis added)). Thus, unlike here, it was physically possible for the passengers in both *Drayton* and *Bostick* to leave the bus.

13

*State v. Zachery Kyle Meredith*, No. 100135-5

least one of them was armed. This "'threatening presence of several officers'" further weighs in favor of holding that Meredith was seized. *Young*, 135 Wn.2d at 512 (quoting *Mendenhall*, 446 U.S. at 554 (plurality portion)). It would have been apparent to any reasonable person on the bus that the uniformed deputies were working as a team, in their official capacity as police officers, and that Deputy Dalton could have drawn his weapon at any time if he felt the need to do so.

We have already recognized the coercive effect that a weapon can have in a police encounter, which is known to disproportionately affect Black, Indigenous, Latinx, and Pacific Islanders based on reasonable "'fear[s] of how an officer with a gun will react to them.'" *Sum*, 199 Wn.2d at 644 (quoting *Utah v. Strieff*, 579 U.S. 232, 254, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016) (Sotomayor, J., dissenting)); *see also* RACE & CRIM. JUST. SYS., TASK FORCE 2.0: RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM: 2021 REPORT TO THE WASHINGTON SUPREME COURT 12-13 (2021), https://digitalcommons.law.seattleu.edu/korematsu_center/116 [https://perma.cc/D5C4-4HHA]. Holding that the presence of a weapon is irrelevant in this case, as the dissent suggests, would directly contradict our own recent precedent. *See* dissent at 8-9. Therefore, while this factor does not compel a conclusion that Meredith was seized, it weighs in favor of holding that he was.

In addition, we should consider "'the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Young*,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Zachery Kyle Meredith*, No. 100135-5

135 Wn.2d at 512 (quoting *Mendenhall*, 446 U.S. at 554 (plurality portion)). The State emphasizes that Deputy Dalton's tone of voice when speaking with Meredith was "conversational." Suppl. Br. of Resp't at 14 (citing CP at 95-96). It is true that a conversational tone of voice weighs against holding Meredith was seized. However, we must consider the language the deputy used, in addition to his tone of voice.

As noted above, when Deputy Dalton contacted Meredith, he said, "'[P]roof of payment or ORCA card.'" CP at 106. There is no indication that this was phrased as a question. To the contrary, it is clear from the record that the deputy "'demand[ed] information'" from Meredith to investigate whether he had paid his fare. *O'Neill*, 148 Wn.2d at 577 (quoting *State v. Cormier*, 100 Wn. App. 457, 460-61, 997 P.2d 950 (2000)). When Meredith could not provide the information, the encounter escalated to an arrest on outstanding warrants, made possible through the use of law enforcement resources. Where law enforcement officers perform fare enforcement duties, such escalation could happen to any "*innocent person*" who paid their fare but did not "produce proof" upon request. *Bostick*, 501 U.S. at 438; RCW 36.57A.235(b)(ii), (iv). Therefore, "the possible escalation of a police encounter as events unfold" is highly relevant to our analysis. *Contra* dissent at 17. An innocent person, recognizing that such escalation could occur if

15

*State v. Zachery Kyle Meredith*, No. 100135-5

they fail to comply with a law enforcement officer's request, would reasonably feel compelled to comply.

The totality of the circumstances presented here shows that no reasonable person in Meredith's position would believe that they were free to decline the deputy's request for proof of fare payment. A majority of this court holds that Meredith was seized. *See* concurrence (Madsen, J.) at 1; concurrence (Fearing, J. Pro Tem.) at 11.

B.     RCW 36.57A.235 does not provide justification for the disturbance in this case

The next step of our analysis is to decide whether the State met its "burden of demonstrating that [Meredith's] warrantless seizure falls into a narrow exception to the rule." *Doughty*, 170 Wn.2d at 61. As the concurrences correctly observe, the State does not contend that the deputy had any "well-founded suspicion" of criminal conduct to support the disturbance of Meredith's private affairs. *Id.* at 62; *see* concurrence (Madsen, J.) at 1; concurrence (Fearing, J. Pro Tem.) at 11. Nevertheless, the trial court here concluded that the disturbance was justified by statute. CP at 69. As applied to the record presented in this case, the majority of this court does not agree.[7]

---

[7] As discussed below, we would decide this question on constitutional grounds because that has been the focus of the parties' briefing. The concurrences would "reserve for another day the question of whether RCW 36.57A.235 passes constitutional muster" and, instead, hold that the statutory language does not provide authority for a "commissioned law enforcement officer"

16

*State v. Zachery Kyle Meredith*, No. 100135-5

The applicable statute provides that on a transit vehicle in a public transportation benefit area (PTBA), such as the Swift bus at issue here, "designate[d] persons" have authority to "[r]equest proof of payment from passengers." RCW 36.57A.235(2)(a), (b)(i). If such proof is not provided, the statute further authorizes the designated person to "[r]equest personal identification," "[i]ssue a citation," and "[r]equest that a passenger leave the bus or other mode of public transportation." *Id.* at (2)(b)(ii)-(iv).

"[A]uthority granted by a valid[ ] (*i.e.*, constitutional) statute" can provide the "authority of law" needed to support a disturbance of private affairs. *State v. Gunwall*, 106 Wn.2d 54, 68, 720 P.2d 808 (1986); *see also* Charles W. Johnson & Debra L. Stephens, *Survey of Washington Search and Seizure Law: 2019 Update*, 42 SEATTLE U. L. REV. 1277, 1341, 1389 (2019) (noting statutes providing authority of law for administrative search warrants "issued on less than probable cause" and authority upholding Washington's amended "stop-and-identify statute"). Therefore, the question is whether the authority granted by RCW 36.57A.235 is constitutional. "'We presume statutes are constitutional and review challenges to them de novo.'" *State v. Villela*, 194 Wn.2d 451, 456, 450 P.3d 170

---

to conduct fare enforcement. Concurrence (Fearing, J. Pro Tem.) at 9; *see also* concurrence (Madsen, J.) at 1. Both analyses lead to the conclusion that Deputy Dalton's actions were not justified by statute in this case.

17

*State v. Zachery Kyle Meredith*, No. 100135-5

(2019) (internal quotation marks omitted) (quoting *State v. Lanciloti*, 165 Wn.2d 661, 667, 201 P.3d 323 (2009)).

Meredith does not challenge the facial constitutionality of the statute. Instead, he brings an "as-applied challenge," contending that article I, section 7 cannot permit "a fully armed law enforcement officer" to disturb the private affairs of passengers on moving public transit vehicles without reasonable suspicion for purposes of fare enforcement. Wash. Sup. Ct. oral argument, *State v. Meredith*, No. 100135-5 (Feb. 17, 2022), at 3 min., 51 sec. and 1 min., 57 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. On the narrow question presented, Meredith has met his burden of proving that RCW 36.57A.235 is unconstitutional as applied.

"Interference with the broad right to privacy can be legally authorized by statute or common law, but only insofar as is reasonably necessary to further substantial governmental interests that justify the intrusion." *State v. Chacon Arreola*, 176 Wn.2d 284, 292, 290 P.3d 983 (2012). "Within this [article I, section 7] framework, 'reasonableness does have a role to play' along with history, precedent, and common sense in defining both the broad privacy interests protected from disturbance, as well as the scope of disturbance that is or may be authorized by law." *Id.* at 291 (citations omitted) (quoting *State v. Day*, 161 Wn.2d 889, 894, 168 P.3d 1265 (2007)). Therefore, to determine the

18

constitutionality of RCW 36.57A.235(2)(b), we must consider (1) the scope of

disturbance that the statute authorizes, (2) the governmental interests underlying

the statute, and (3) reasonableness, history, precedent, and common sense.

    1.     As applied in this case, RCW 36.57A.235 purports to authorize a
            significant disturbance

First, we must evaluate the scope of the disturbance authorized by RCW

36.57A.235 in the context of this as-applied challenge. Doing so shows that the

scope of disturbance varies considerably with the status of the person designated to

conduct fare enforcement. It is up to each PTBA to "designate persons to monitor

fare payment." RCW 36.57A.235(2)(a); *see also* RCW 36.57A.230(1). Therefore,

different agencies have adopted different fare enforcement practices.

Community Transit, which runs the Swift Blue Line at issue here, employs

police officers to conduct fare enforcement.[8] The officers are given very little

"training specific to joining the transit unit." CP at 209. However, they often

work with "Swift ambassadors," civilians who request proof of payment from the

bus passengers and "advise" the police officers if there is "any person that can't

---

[8] As Justice Pro Tempore Fearing's concurrence correctly notes, the record does not disclose the precise employment or contractual relationship between Community Transit and law enforcement. *See* concurrence (Fearing, J. Pro Tem.) at 3-5. Although we would decline to decide the case on that basis, the concurrence properly highlights how *law* enforcement officers acting as *fare* enforcement officers can obscure the distinction between those two roles, as occurred here. *See id.* at 5-9.

*State v. Zachery Kyle Meredith*, No. 100135-5

provide proof of payment." *Id.* at 211. The officers "confer with the community transit fare ambassadors" in determining how to handle such situations. *Id.*

Yet, "[o]n this particular day [they] didn't have any Swift ambassadors to work for [them,] so [the police officers] worked as a team of two deputies riding the bus fully outfitted in [their] patrol uniforms and then one deputy in a chase car in case [they] dealt with anybody." *Id.* at 212. Thus, as applied to these particular circumstances, the statute purported to authorize Deputy Dalton (an armed, uniformed police officer) to disturb the private affairs of Meredith (a passenger on a public bus traveling between stops) for purposes of fare enforcement, despite having no reason to suspect Meredith had not paid. As detailed above, this created a situation in which a reasonable person in Meredith's position would have felt compelled to comply with the deputy's requests. This disturbance of Meredith's private affairs was significantly greater than it would have been if unarmed, civilian Swift ambassadors were conducting fare enforcement on the bus.

The practices of other Washington transit agencies further demonstrate the high level of intrusion that occurred here. For instance, "Sound Transit hires non-law enforcement contractors for fare compliance," and the agency "periodically updates its practices to ensure its transit services are safe, efficient and equitable." Amicus Br. of Sound Transit, Cmty. Transit, King County Metro & Wash. State. Transit Ass'n at 10, 9. As a result, "[i]n 2020, Sound Transit initiated a Fare

20

*State v. Zachery Kyle Meredith*, No. 100135-5

Ambassador Program in response to community concerns" that Black, Indigenous, and other People of Color were disproportionately cited for nonpayment. *Id.* at 11.

In addition to "educating [passengers] about how to purchase fare passes, how to obtain fare assistance, and the importance fares play in helping Sound Transit serve its constituents," Sound Transit ambassadors ask passengers for proof of payment. *Id.* However, their approach to fare enforcement is very different from the approach taken in this case. On Sound Transit, "[i]f a rider is unable to present proof-of-payment, the rider is asked to identify themselves; if the rider provides identification, their identity is recorded solely for statistical purposes; if the rider refuses, the ambassador politely counsels the rider by providing an informal warning." *Id.* at 11-12. The ambassadors do not contact law enforcement officers "unless a rider presents a danger to themselves or to others." *Id.* at 12.

King County Metro "also widely utilizes barrier-free systems" and "uses fare enforcement to prevent fare evasion." *Id.* at 14, 16. However, as part of an effort "to measure and reduce any disproportionate impact that fare enforcement may have on historically disadvantaged populations," the county "enacted an ordinance creating an internal process as an alternative to citing individuals for fare evasion," such that "[v]iolations are handled without law enforcement or court intervention." *Id.* at 17. Although fare enforcement officers may "issue warnings

21

*State v. Zachery Kyle Meredith*, No. 100135-5

or notices," King County Metro must "provide options on how to resolve violations without paying a fine." *Id.*

We do not mean to express any opinion on the constitutionality of Sound Transit or King County Metro's practices as applied in any particular case. Instead, we use this information to gauge the scope of the disturbance authorized by RCW 36.57A.235. As shown by comparing the events of this case with the practices used by other transit agencies, the scope of the disturbance purportedly authorized by the statute is significantly diminished when it is exercised by unarmed civilians.

> 2. The State does not show a substantial governmental interest in this particular method of fare enforcement, as opposed to fare enforcement generally

Next, we must consider whether there are "substantial governmental interests that justify the intrusion." *Chacon Arreola*, 176 Wn.2d at 292. We fully agree with the State that the government has a substantial interest in operating public transit, and that "the transit authority has an interest in ensuring that fares are paid." Suppl. Br. of Resp't at 10; *see also 2021 Summary of Public Transportation*, WASH. STATE DEP'T OF TRANSP., 18, 24 (Sept. 2022), https://www.wsdot.wa.gov/publications/manuals/fulltext/M3079/spt.pdf.

However, this as-applied challenge does not depend on the government's general interest in fare enforcement but on the government's specific interest in the

22

*State v. Zachery Kyle Meredith*, No. 100135-5

particular method of fare enforcement used here. The State neither asserts nor explains why that specific interest is substantial. Moreover, as discussed above, the practices of other transit agencies (and even the ordinary practices of Community Transit) indicate that the government does not have a substantial interest in the particular method of fare enforcement used in this case. Thus, the only substantial governmental interest shown here is a general interest in fare enforcement.

> 3.    The particular method of fare enforcement used here is not reasonably necessary to the government's general interest in fare enforcement

Finally, we consider whether the disturbance of Meredith's private affairs in this case exceeded what was "reasonably necessary to further substantial governmental interests." *Chacon Arreola*, 176 Wn.2d at 292. To make this determination, we consider "'reasonableness . . .' along with history, precedent, and common sense." *Id.* at 291 (quoting *Day*, 161 Wn.2d at 894).

As a matter of both reasonableness and common sense, unless mass transit is offered for free, transit operators must be able to charge and collect fares from passengers. Therefore, as history and this court have long recognized, passengers using mass transit must pay their fares or they "may be ejected." *Loy v. N. Pac. Ry. Co.*, 68 Wash. 33, 39, 122 P. 372 (1912); *see also State v. Mitchell*, 190 Wn. App. 919, 361 P.3d 205 (2015) (interpreting RCW 35.58.585(2)(b)), *review denied*, 185 Wn.2d 1024 (2016). We do not question that premise.

*State v. Zachery Kyle Meredith*, No. 100135-5

However, in this case, Meredith was asked for proof of payment by law enforcement officers, who then identified and arrested him using resources that no civilian conducting fare enforcement could have accessed. Although we are not asked to opine on the constitutionality of these later actions, they could not have occurred without the initial seizure.

Moreover, as detailed above, the risk of such escalation would be acutely felt by reasonable transit passengers, who are more likely to be members of "historically marginalized groups," including Black, Indigenous, and other People of Color. Br. of Amici Curiae ACLU (Am. C.L. Union) of Wash., Wash. Def. Ass'n & King County Dep't of Pub. Def. at 20. Members of such groups are already known to be "'disproportionate victims'" of "police encounters without reasonable suspicion." *Sum*, 199 Wn.2d at 644 (quoting *Strieff*, 579 U.S. at 254 (Sotomayor, J., dissenting)). If allowed to continue, the high level of intrusion that occurred here would only exacerbate these disparities. The State has not shown such an outcome is reasonably necessary to further the governmental interest in fare enforcement on public transit.

In this way, this case is analogous to *State v. Marchand* in which we invalidated statutes that broadly "authorize[d] any officer, without reasonable suspicion or probable cause, during daylight hours, in a plainly marked patrol car, to stop *any* motorist," in part because "[t]he assertion that the practice contributes

24

to highway safety is completely unsupported." 104 Wn.2d 434, 439, 437, 706 P.2d

225 (1985); *see also City of Seattle v. Mesiani*, 110 Wn.2d 454, 459, 755 P.2d 775

(1988) (invalidating warrantless seizures at "sobriety checkpoints," in part because

the city failed to show "that less intrusive alternatives could not achieve most of

the constitutionally permissible benefits sought"); *State v. White*, 97 Wn.2d 92, 96,

99, 640 P.2d 1061 (1982) (invalidating "stop-and-identify" statute, former RCW

9A.76.020 (1975), in part because it "encourage[d] arbitrary and erratic stops and

arrests").

As applied in this case, RCW 36.57A.235 purported to authorize a much

greater level of intrusion than is reasonably necessary to further the governmental

interest in fare enforcement on public transit. Therefore, the justices in the lead

opinion would hold that Meredith has met his burden of proving that the statute is

unconstitutional as applied to the particular facts of this case, such that RCW

36.57A.235 does not provide authority of law to justify the disturbance of

Meredith's private affairs. The concurring justices agree that the statute did not

provide authority of law in this case, but they would reach that conclusion as a

matter of statutory interpretation, rather than constitutional law. *See* concurrence

(Madsen, J.) at 1; concurrence (Fearing, J. Pro Tem.) at 9.

*State v. Zachery Kyle Meredith*, No. 100135-5

C.      Based on the record presented, no other exception to the warrant requirement applies

In addition to RCW 36.57A.235, the State contends that the disturbance of Meredith's private affairs was lawful based on either "the special needs doctrine" or Meredith having "validly consented to being seized." Suppl. Br. of Resp't at 27, 18. In light of the record presented, a majority of this court declines to apply either of those exceptions to the warrant requirement in this case. *See* concurrence (Madsen, J.) at 1; concurrence (Fearing, J. Pro Tem.) at 11.

1.      The special needs doctrine does not apply here

First, we briefly address the special needs doctrine. As a matter of Fourth Amendment law, the federal special needs doctrine provides that "[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion."[9] *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 624, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989). It is true that this court has sometimes "looked to federal special needs cases when dealing with similar issues." *York v. Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297, 312, 178 P.3d 995 (2008) (plurality opinion). However, "we have not created a general,

---

[9] For purposes of this opinion, we assume the special needs doctrine applies to seizures. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 736, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011).

26

special needs exception" and the State does not show that we should do so now.

*Id.* at 314.

As discussed above, we agree with the State that the government has a

general need for fare enforcement on barrier-free transit. Moreover, at least

arguably, "the warrant and probable cause requirement are impracticable" for fare

enforcement purposes. Suppl. Br. of Resp't at 28 (citing *State v. Griffith*, 11 Wn.

App. 2d 661, 672, 455 P.3d 152 (2019)). However, the State does not show that it

has a special need for the particular method of fare enforcement used here.

Therefore, the State has not met its burden of showing that the special needs

doctrine applies.

2. Based on the record presented, Meredith did not consent to the method of fare enforcement used here merely by boarding the bus

Finally, we address consent. As noted, the Court of Appeals determined that

the disturbance of Meredith's private affairs was lawful on the basis that he "chose

freely to contract with Swift [Transit]" and therefore agreed to comply with "his

duty to pay his fare and provide proof of payment when asked." *Meredith*, 18 Wn.

App. 2d at 511, 514. The court thus determined that Meredith "was aware of the

possible seizure of his person and consented to it." *Id.* at 514. The State urges us

to adopt the Court of Appeals' analysis, but we cannot do so based on the record

presented.

*State v. Zachery Kyle Meredith*, No. 100135-5

In the context of searches, consent is a well-established exception, but Meredith contends that individuals "cannot consent to the seizure of their person under article I, section 7."[10]  Suppl. Br. of Pet'r at 13 (citing *State v. Thorp*, 71 Wn. App. 175, 181, 856 P.2d 1123 (1993)).  Meredith is correct that our court has never held that one can consent to a seizure of their person.  Yet, that does not mean Meredith could not consent to his interaction with Deputy Dalton; it means only that if Meredith consented to this interaction, then he was not seized.  In a consensual interaction, the need to respond to the officer's request for proof of payment would arise from Meredith's own consent to do so, rather than the officer's show of authority.  *See State v. Harrington*, 167 Wn.2d 656, 663, 222 P.3d 92 (2009) (if an encounter is consensual, it is not a seizure).  Therefore, we must consider whether the record shows Meredith's consent.

"Our court has set out three requirements for a valid consensual [interaction with police]: (1) the consent must be voluntary, (2) the consent must be granted by a party having authority to consent, and (3) the [interaction] must be limited to the scope of the consent granted."  *State v. Blockman*, 190 Wn.2d 651, 658, 416 P.3d 1194 (2018) (citing *State v. Hastings*, 119 Wn.2d 229, 234, 830 P.2d 658 (1992)).  Although he contends that individuals cannot consent to being seized, Meredith

---

[10] The Court of Appeals treated consent as an exception to the warrant requirement for both searches and seizures.  *Meredith*, 18 Wn. App. 2d at 507.

28

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

does not otherwise argue that he did not have authority to consent. Therefore, the second requirement is not at issue here. However, we must still determine whether Meredith did, in fact, voluntarily consent and, if so, whether the encounter exceeded the scope of Meredith's consent.

"Whether consent is voluntary is a question of fact and depends upon the totality of the circumstances." *State v. Reichenbach*, 153 Wn.2d 126, 132, 101 P.3d 80 (2004) (citation omitted) (citing *State v. Bustamante-Davila*, 138 Wn.2d 964, 981-82, 983 P.2d 590 (1999)). The State relies on the *Loy* case, noted above, to contend that every transit passenger has a "duty to produce a fare when asked" and therefore necessarily consents to doing so. Suppl. Br. of Resp't at 19 (citing *Loy*, 68 Wash. at 39). Additionally, the State contends that "a rider is also notified of fare requirements by signs conspicuously posted at all bus entries" and that "[c]ommon sense dictates that a request to inspect fare may occur." *Id.* at 21. Based on these facts, the State argues that Meredith "voluntarily consented to a limited interaction for the purpose of ensuring that he had paid his fare" when he chose to ride the bus. *Id.*

We agree that a reasonable person should know that they might be asked to provide proof of payment while traveling on a barrier-free transit system, particularly in light of statutes authorizing designated persons to request proof of payment. *See* RCW 35.58.585(2)(b)(i); RCW 36.57A.235(b)(i); RCW

*State v. Zachery Kyle Meredith*, No. 100135-5

81.112.210(2)(b)(i).  It is also true that a statute may imply consent to a warrantless intrusion in specific, limited circumstances.  *See* Johnson & Stephens*, supra*, at 1293 ("[U]nder RCW 46.20.308, any person who operates a vehicle is deemed to have consented to a blood alcohol test.").

By choosing to ride the bus, Meredith may have impliedly consented to a limited interaction with a person conducting fare enforcement while on board.  However, this does not mean that Meredith consented to the particular method of fare enforcement used here.  The statute makes no mention of this possibility, and the record does not tell us what language was used on the "conspicuously posted" signs on which the State relies.  Suppl. Br. of Resp't at 21.  Without evidence that Meredith was informed that fare enforcement on the bus may involve questioning by law enforcement officers, the State cannot meet its burden of proving that Meredith voluntarily consented to such an interaction merely by boarding.  Therefore, we do not reach the issue of whether the interaction between Meredith and Deputy Dalton exceeded the scope of Meredith's consent.  No such consent was given, nor could it be implied.

Neither the federal special needs doctrine nor consent provides the authority of law necessary to justify the disturbance of Meredith's private affairs in this case.  A majority of this court holds that Meredith was "unlawfully seized."  Concurrence (Fearing, J. Pro Tem.) at 11; *see also* concurrence (Madsen, J.) at 1 ("Deputy

30

*State v. Zachery Kyle Meredith*, No. 100135-5

Dalton had neither the authority of law nor a reasonable suspicion that a crime had been committed to justify the seizure."). The resulting evidence must be suppressed. *State v. Mayfield*, 192 Wn.2d 871, 888, 434 P.3d 58 (2019).

CONCLUSION

Barrier-free transit is an important service that allows passengers to reach their destinations faster and eliminates the expenses associated with maintaining barriers. We do not strike down any statute permitting designated persons to request proof of fare payment on barrier-free transit systems. We reject only the particular method of fare enforcement used here, given the lack of legal justification in the record. Our holding is necessary both to preserve the constitutional privacy rights of transit passengers and to mitigate the known, racially disproportionate impact of such fare enforcement practices.

Thus, a majority of this court holds that Meredith was unlawfully seized. *See* concurrence (Madsen, J.) at 1; concurrence (Fearing, J. Pro Tem.) at 11. In doing so, we do not "announce a sweeping holding" that "contact with a police officer checking fares on a barrier-free bus amounts to an unconstitutional seizure." *Contra* dissent at 1. In this as-applied challenge, we hold only that this particular method of fare enforcement, as used in this case, disturbed Meredith's private affairs and lacked lawful justification based on the record presented.

31

*State v. Zachery Kyle Meredith*, No. 100135-5

Accordingly, we reverse the decision of the Court of Appeals and remand to the

trial court for further proceedings.

_____
Yu, J.


WE CONCUR:

_____
González, C.J.

_____

_____
Gordon McCloud, J.

_____

_____

32

*State v. Meredith (Zachery Kyle)*

No. 100135-5

MADSEN, J. (concurring)—I agree entirely with the concurring opinion by Justice Pro Tempore Fearing that this case can be resolved on statutory grounds. I write separately, however, because I cannot agree that a police officer, even though armed and in uniform, on a moving bus, who asks a bus rider for proof of payment or an ORCA card (fare payment card), has unlawfully seized that bus rider. Rather, under the facts here, I believe Zachery Meredith was seized when he was detained after being removed from the bus. "Upon reaching the next stop, Deputy [Thomas] Dalton detained [Meredith] outside at the bus platform." Clerk's Papers at 67. At this point Meredith was not free to leave.

Because there was no proof that Deputy Dalton was designated as a fare enforcement officer, or that the fare enforcement statute authorizes a law enforcement officer to act as a fare enforcement officer, Deputy Dalton had neither the authority of law nor a reasonable suspicion that a crime had been committed to justify the seizure.

_____
Madsen, J.

No. 100135-5

FEARING. J.* (concurring) – Primary goals of public transit authorities include quickening the process of boarding a bus in order to reduce a rider's transit time and maximizing collection of fares.  Zachery Meredith's appeal spotlights these competing objectives by asking this court to determine the legality of law enforcement officers' monitoring of fare payments on the Community Transit Swift Blue Line.  Buses on the line stop for only 10 seconds per station in order to get passengers there fast.  About *Swift*, CMTY. TRANSIT, https://www.communitytransit.org/aboutswift (last visited on Mar. 6, 2023).  Passengers pay at the platform or carry an electronic pass, rather than paying or showing proof of payment when entering one of three bus doors.

In response to petitioner Zachery Meredith's challenge to the sheriff deputies' enforcement of fare payment on the Swift Blue Line, the lead opinion announces six holdings.  First, Snohomish County Sheriff Deputy Thomas Dalton seized Meredith, within the meaning of article I, section 7 (Section 7) of the Washington Constitution, when demanding that Meredith show proof of payment on the bus on March 28, 2018.  Second, uniformed and armed police officers are not reasonably necessary to further the governmental interest in fare enforcement on public transit.  Third, any governmental

---

*Judge George B. Fearing is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 100135-5 (Fearing J.P.T., concurring)

interest in fare enforcement by armed, uniformed police officers, rather than by fare enforcement agents, does not outweigh the significant disturbance to a passenger's privacy caused by a law enforcement officer seizing the passenger on a moving bus. The third holding follows from the second holding. Fourth, to the extent that RCW 36.57A.235 authorizes a law enforcement officer to confront a public bus passenger in order to confirm fare payment, the statute violates Section 7. This fourth holding follows from holdings two and three. Fifth, the special needs doctrine did not excuse the warrantless seizure of Zachery Meredith. Sixth, the record does not support a finding that Meredith consented to a seizure by Deputy Dalton.

RCW 36.57A.235 controls this appeal. The statute authorizes a "fare enforcement officer" to approach bus riders on public transit and demand proof of fare payment. The lead opinion's holding four assumes that RCW 36.57A.235 authorizes a law enforcement officer to function as a fare enforcement officer.

I applaud the thorough, sensitive, and astute analysis of the lead opinion. Nevertheless, I disagree that RCW 36.57A.235 authorizes a law enforcement officer to serve as a fare enforcement officer. I would instead hold that Sheriff Deputy Thomas Dalton was not an authorized fare enforcement officer under RCW 36.57A.235 or any other statute, that a fare enforcement officer lacks authority to investigate crime, that general principles behind Section 7 govern the lawfulness of the seizure of Meredith, that Deputy Dalton lacked authority of law to seize Meredith unless he then possessed

2

No. 100135-5 (Fearing J.P.T., concurring)

reasonable suspicion of Meredith's commission of a crime, and that Deputy Dalton

lacked any suspicion that Meredith committed a crime when confronting Meredith.

Resolution of this appeal requires the perusal of not only RCW 36.57A.235 but

also five other state statutes: RCW 7.80.040, RCW 7.80.050, RCW 7.80.060,

RCW 36.57A.230, and RCW 36.57A.240.  I begin with the appeal's critical statute,

RCW 36.57A.235, which governs fare enforcement by a public transportation benefit

area such as Community Transit:

> (1) A public transportation benefit area may establish, by resolution, a schedule of fines and penalties for civil infractions established in RCW 36.57A.230. . . .
>     (2)(a) *A public transportation benefit area may designate persons to monitor fare payment who are equivalent to, and are authorized to exercise all the powers of, an enforcement officer as defined in RCW 7.80.040.  A public transportation benefit area may employ personnel to either monitor fare payment or contract for such services, or both.*
>     (b) In addition to the specific powers granted to enforcement officers under RCW 7.80.050 and 7.80.060, persons designated to monitor fare payment may also take the following actions:
>     (i) Request proof of payment from passengers;
>     (ii) Request personal identification from a passenger who does not produce proof of payment when requested;
>     (iii) Issue a citation conforming to the requirements established in RCW 7.80.070; and
>     (iv) Request that a passenger leave the bus or other mode of public transportation when the passenger has not produced proof of payment after being asked to do so by a person designated to monitor fare payment.
>     . . . .

(Emphasis added.)  To repeat, the lead opinion assumes that Sheriff Deputy Thomas

Dalton was an "enforcement officer" for purposes of the statute.

3

No. 100135-5 (Fearing J.P.T., concurring)

RCW 36.57A.235 mentions the public transportation benefit area "employing" fare enforcement officers or the area "contracting" for enforcement services. The evidence presented during the hearing on Zachery Meredith's motion to suppress constitutes the facts for this appeal. The State failed to produce any evidence during the pretrial hearing, let alone during the later trial, to establish that Community Transit employed law enforcement officers as fare enforcement officers or contracted with the Snohomish County Sheriff's Office to provide these services. Generally, when questioning a law enforcement officer during a criminal hearing, the State's attorney asks if the officer was working as a duly authorized law enforcement officer at the time of an investigation or an arrest. The State's attorney did not ask Deputy Dalton, during either the hearing to suppress or the trial, if he was an authorized fare enforcement officer at the time of detaining Zachery Meredith.

The lead opinion reads, "Community Transit, which runs the Swift Blue Line at issue here, *employs* police officers to conduct fare enforcement." Lead opinion at 19 (emphasis added). I do not know if the opinion intends "employ" to mean a formal hiring or contracting, within the meaning of RCW 36.57A.235, or simply the ad hoc use of law enforcement officers on occasion. Regardless, in addition to a lack of evidence of employment of any sheriff deputy, the district court, when denying the motion to suppress, entered no finding that Community Transit employed Deputy Dalton as a fare

4

No. 100135-5 (Fearing J.P.T., concurring)

enforcement officer or that Community Transit contracted with the Snohomish County

Sheriff's Office for enforcement services.

A related statute, RCW 36.57A.230, also discusses the role of a person designated

to monitor fare payment for a public transportation benefit area:

> (1) Persons traveling on public transportation operated by a public transportation benefit area shall pay the fare established by the public transportation benefit area and shall produce proof of payment in accordance with the terms of use established by the public transportation benefit area. *Such persons shall produce proof of payment when requested by a person designated to monitor fare payment.* . . .

(Emphasis added.) This companion statute also insists that the person demanding proof

of payment be "designated" by the benefit area "to monitor fare payment." Neither RCW

36.57A.230 nor RCW 36.57A.235 empower a law enforcement officer, by reason of

being a commissioned officer, to monitor payment. The State provided no evidence, and

the district court entered no finding, that Community Transit designated Sheriff Deputy

Thomas Dalton to monitor fare payment.

RCW 36.28.020 grants each sheriff deputy the power to "perform any of the

duties, prescribed by law to be performed by the sheriff." RCW 36.28.010 lists the

powers of the county sheriff, which do not include the power to perform the services of a

fare enforcement officer.

RCW 36.57A.240 provides further insight into resolving this appeal. The statute

declares, in pertinent part:

5

No. 100135-5 (Fearing J.P.T., concurring)

> RCW 36.57A.230 and 36.57A.235 do not prevent *law enforcement authorities* from prosecuting for theft, trespass, or other charges by any individual who:
>
> . . . .
>
> (3) Fails to depart the bus or other mode of public transportation *when requested to do so by a person designated to monitor fare payment.*

(Emphasis added.) The statute identifies two distinct persons, "a law enforcement authority" and "a person designated to monitor fare payment." The statute does not hint that the law enforcement officer and the fare enforcement officer may be the same person. When the legislature elects to use different terms in the same statute, courts cannot interpret the different terms to have the same meaning. *Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 219, 173 P.3d 885 (2007); *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 160, 3 P.3d 741 (2000). When a statute employs different words, courts presume a different meaning attaches to each word. *State ex rel. Pub. Disclosure Comm'n v. Rains*, 87 Wn.2d 626, 634, 555 P.2d 1368 (1976).

The lead opinion begins to accept my analysis by hinting that RCW 36.57A.235 does not authorize a law enforcement officer to engage in fare enforcement. The lead opinion writes:

> By choosing to ride the bus, Meredith may have impliedly consented to a limited interaction with *a person conducing fare enforcement* while on board. However, this does not mean that Meredith consented to the particular method of fare enforcement used here. The statute makes no mention of this possibility . . . .

Lead opinion at 29 (emphasis added).

6

No. 100135-5 (Fearing J.P.T., concurring)

Sheriff Deputy Thomas Dalton testified that he arrested Zachery Meredith for theft. RCW 36.57A.230 and RCW 36.57A.235 not only preclude a finding that Deputy Dalton served as a fare enforcement officer but the two statutes and related statutes also extended Deputy Dalton no authority to arrest Zachery Meredith for the crime of theft of services, let alone any crime, because of nonpayment of the fare. Assuming Deputy Dalton functioned as a fare enforcement officer, he lacked authority to seize or arrest Meredith for a crime. Deputy Dalton could only issue Meredith an infraction.

RCW 36.57A.230, which I previously quoted in part, also reads:

> (2) The following *constitute civil infractions* punishable according to the schedule of fines and penalties established by a public transportation benefit area under RCW 36.57A.235:
> (a) Failure to pay the required fare, except when a public transportation benefit area fails to meet the requirements of subsection (3) of this section;
> (b) Failure to produce proof of payment in the manner required by the terms of use established by the public transportation benefit area including, but not limited to, the failure to produce a validated fare payment card when requested to do so by a person designated to monitor fare payment; and
> (c) Failure to depart the bus or other mode of public transportation when requested to do so by a person designated to monitor fare payment.
> . . . .

(Emphasis added.)

As already stated, RCW 36.57A.235(2)(a) authorizes the transportation authority to appoint fare payment monitors. In turn, the statute declares that the monitors will possess those powers listed in RCW 7.80.040. The latter statute provides:

7

No. 100135-5 (Fearing J.P.T., concurring)

> As used in this chapter, "enforcement officer" means a person authorized to enforce the provisions of the title or ordinance in which the civil infraction is established.

This short statute grants the enforcement officer authority only to enforce a limited group of ordinances, not to engage in a broad ranging investigation of crime or to determine if the infractee is the subject of outstanding arrest warrants.

RCW 36.57A.235(2)(b) cites RCW 7.80.050 and 7.80.060 to add to the list of tasks a fare enforcement officer may undertake. The first of the two statutes authorizes the enforcement officer to issue infractions that occur in the officer's presence. The second statute empowers the fare enforcement officer to demand the infractee to identify himself or herself by giving his or her name, address, and date of birth. RCW 7.80.060 declares, in part:

> A person who is unable or unwilling to reasonably identify himself or herself to an enforcement officer may be detained for a period of time not longer than is reasonably necessary to identify the person for purposes of issuing a civil infraction.

The statute also does not authorize the enforcement officer to arrest the infractee for a crime.

One may ask if, despite limiting the enforcement officer to issuing an infraction, a law enforcement officer accompanying the enforcement officer may arrest the nonpaying lawbreaker for theft. The answer is no, except in limited circumstances. RCW 36.57A.240, which I previously quoted in part, reads in its entirety:

8

No. 100135-5 (Fearing J.P.T., concurring)

> RCW 36.57A.230 and 36.57A.235 do not prevent *law enforcement authorities* from prosecuting for theft, trespass, or other charges by any individual who:
> (1) *Fails to pay the required fare on more than one occasion* within a twelve-month period;
> (2) Fails to timely select one of the options for responding to the notice of civil infraction after receiving a statement of the options for responding to the notice of infraction and the procedures necessary to exercise these options; or
> (3) Fails to depart the bus or other mode of public transportation *when requested to do so by a person designated to monitor fare payment.*

(Emphasis added.)

Sheriff Deputy Thomas Dalton lacked any notice that Zachery Meredith failed to pay the required fare on more than one occasion. Meredith did not fail to respond to a notice of civil infraction since Deputy Dalton never issued one. Meredith did not refuse to depart from the bus, let alone fail to depart after a request from a fare payment monitor. No fare payment monitor was even present.

According to the record, Deputy Thomas Dalton never considered issuing Zachery Meredith a civil infraction for nonpayment of the bus fare, the only remedial action authorized to be taken by a fare enforcement officer. Instead, Deputy Dalton concluded that Meredith committed the crime of theft. Deputy Dalton or his colleague, Sergeant Luis Zelaya, researched whether Meredith had any pending arrest warrants. The State did not charge Meredith with theft but with uttering a false or misleading statement to a public official. This recitation of facts suggests that locating citizens with outstanding

9

No. 100135-5 (Fearing J.P.T., concurring)

arrest warrants constituted an alternate purpose behind sheriff deputies enforcing fare payment.

I would rule that based on the record, no commissioned law enforcement officer, let alone Deputy Thomas Dalton, held authority under RCW 36.57A.235 to approach a Community Transit rider and demand proof of fare payment. I would reserve for another day the question of whether RCW 36.57A.235 passes constitutional muster when a law enforcement officer detains a rider for fare enforcement, assuming a Community Transit Board of Directors resolution authorizes a law enforcement officer to engage in fare enforcement or the transit authority enters into a contract with the Snohomish County Sheriff's Office.

The lead opinion's holdings raise questions as to the extent of prohibitions on a law enforcement officer engaging in public transit fare enforcement. Sometimes the lead opinion refers to an "an armed, uniformed police officer." Lead opinion at 19; *see also* id. at 3, 13, 17. In another sentence, the opinion references the officer being "fully uniformed." Lead opinion at 13. The lead opinion also occasionally emphasizes that Deputy Thomas Dalton was accompanied by another uniformed officer. Finally, when holding that Deputy Dalton seized Zachery Meredith, the lead opinion qualifies its ruling by mentioning that the bus moved when Deputy Dalton approached Meredith and that Meredith could not avoid the attention of Deputy Dalton by exiting from the bus. Lead opinion at 4, 12. One wonders, after dissecting the lead opinion's ruling, whether Section

10

No. 100135-5 (Fearing J.P.T., concurring)

7 would permit a sheriff deputy to monitor fare payment if the officer wore civilian clothes, possessed no gun, and worked unaccompanied by another deputy. One also wonders if an armed and uniformed sheriff deputy could stand on the bus platform and check for payment as passengers exited the bus.

In order to avoid constitutional stagnation, this court occasionally addresses constitutional questions unnecessary to the outcome of the appeal. *In re Citizen Complaint by Stout*, 198 Wn.2d 180, 199, 493 P.3d 1170 (2021) (Yu, J. concurring). Nevertheless, this court typically follows the general practice of declining to reach constitutional issues. *State v. Hall*, 95 Wn.2d 536, 539, 627 P.2d 101 (1981). When an issue may be resolved on statutory grounds, the court will avoid deciding the issue on constitutional grounds. *State v. Blake*, 197 Wn.2d 170, 192, 481 P.3d 521 (2021); *Tunstall v. Bergeson*, 141 Wn.2d 201, 210, 5 P.3d 691 (2000).

In order to advance the law a step or two, this court may wish to preclude law enforcement officers, under Section 7, from any participation in fare collection because of the heavy-handedness of this participation or because police can abuse the fare monitoring task by using it for other purposes. Otherwise, if this court narrowly held that Sheriff Deputy Thomas Dalton did not serve as a fare enforcement officer, the court could avoid declaring RCW 36.57A.235 unconstitutional as applied to the circumstances of this appeal. The court would then allow a transit authority an opportunity to devise

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 100135-5 (Fearing J.P.T., concurring)

alternative and constitutional ways in which law enforcement officers could assist in monitoring fare payments.

By limiting its holding, this court would also afford the legislature the opportunity to amend statutes to grant law enforcement officers some role in fair fare enforcement. I provide some examples of possible legislative changes, without addressing potential constitutional permissibility or infirmity. The legislature could expressly designate law enforcement officers as fare enforcement officers with the power to issue a citation, but not to arrest, search, or research for warrants. The legislature could explicitly declare that failure to pay a fare constitutes a crime and also direct the posting of signs at conspicuous locations that inform the rider that uniformed law enforcement officers may engage in fare enforcement.

Under my analysis, the court must still determine whether Deputy Thomas Dalton could legally stop and seize Zachery Meredith. Although Deputy Dalton did not serve as a fare enforcement officer, he possessed the right to occupy the bus, talk with passengers, protect public safety, and prevent crime. But the answer to this question comes easy and needs no new pronouncement of search and seizure law. The answer also does not require infirming a statute in part. I would hold the law enforcement officers are not authorized under the statute to conduct fare enforcement and, because Deputy Dalton lacked any reasonable suspicion to conclude that Meredith committed a crime or was about to commit a crime, Deputy Dalton unlawfully seized Meredith when he, while

12

No. 100135-5 (Fearing J.P.T., concurring)

armed and wearing full uniform and while the bus moved, approached Meredith and demanded to see proof of payment. *State v. Fuentes*, 183 Wn.2d 149, 158, 352 P.3d 152 (2015). The State does not argue that Deputy Dalton possessed reasonable suspicion before Deputy Dalton confronted Meredith.

I concur in the lead opinion's decision to reverse the Court of Appeals decision because of the violation of Zachery Meredith's right of privacy under article I, section 7, of the Washington Constitution.

Fearing, J.P.T.
_____
Fearing, J.P.T.

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Meredith*, No. 100135-5
(Stephens, J., dissenting)

No. 100135-5

STEPHENS, J. (dissenting)—The lead opinion correctly frames this case as presenting "a narrow, as-applied challenge to the particular method of fare enforcement used in this case." Lead opinion at 8. Yet, it would announce a sweeping holding: contact with a police officer checking fares on a barrier-free bus amounts to an unconstitutional seizure. The lead opinion further rejects the lower court's conclusion that given the nature of barrier-free transit, bus riders such as Zachary Meredith effectively consent to being stopped and asked for proof of payment during the ride. *State v. Meredith*, 18 Wn. App. 2d 499, 511, 514, 492 P.3d 198 (2021). While I share some of the concerns expressed by the lead opinion and would not rely on the doctrine of consent, I believe that our precedent more carefully describes when a seizure for constitutional purposes occurs. And the context of a contact with law enforcement always matters. Under the facts of this case, Deputy Dalton did not seize Meredith when he contacted him on the bus to check whether he had paid his fare. I respectfully dissent.

1

*State v. Meredith*, No. 100135-5
(Stephens, J., dissenting)

ANALYSIS

It is undeniable that people hold varying views about encounters with police officers and the role that police officers should play in society. This case presents a narrow and specific legal question regarding that role: "whether Deputy Dalton's request for proof of payment [from Zachary Meredith] was accompanied by a 'display of authority,' such that a reasonable person 'would not believe' they were free to 'decline [the] request.'" Lead opinion at 11 (quoting *State v. Rankin*, 151 Wn.2d 689, 695, 92 P.3d 202 (2004)). While the lead opinion states that "a majority of this court holds that Meredith was unlawfully seized," lead opinion at 2, the question before us is not whether he was seized *at some point* but, specifically, whether he was seized when Deputy Dalton conducted fare enforcement *on the bus*. *See* Pet. for Rev. at 5 (arguing Meredith was seized at the moment Deputy Dalton asked for "'proof of payment or ORCA card'"). No one appears to dispute that Meredith was seized at some point in his encounter with Deputy Dalton—indeed, the encounter escalated to Meredith's formal arrest on the bus platform. In answer to the specific question before us, a majority of this court concludes Deputy Dalton's conduct in seeking proof of payment aboard the moving Swift bus did not amount to a seizure within the meaning of article I, section 7 of the Washington Constitution. *See* dissent (Stephens, J., joined by Johnson, Owens, and Whitener, JJ.); concurrence

2

*State v. Meredith*, No. 100135-5
(Stephens, J., dissenting)

(Madsen, J.) at 1 ("I cannot agree that a police officer, even though armed and in uniform, on a moving bus, who asks a bus rider for proof of payment or an ORCA card (fare payment card), has unlawfully seized that bus rider.").[1] Police officers may interact with individuals in the course of performing certain governmental functions without invading their constitutional privacy rights under article I, section 7 of our constitution. *See State v. O'Neill*, 148 Wn.2d 564, 578-79, 62 P.3d 489 (2003) (holding that an officer's action of approaching a parked vehicle, knocking on the window, and asking for identification did not constitute a seizure). While our state constitution "grants greater protection to individual privacy rights than the Fourth Amendment" to the United States Constitution, *State v. Harrington*, 167 Wn.2d 656, 663, 222 P.3d 92 (2009), we still recognize that not every contact with law enforcement amounts to a seizure. Specifically, a seizure occurs only when, under all the surrounding circumstances, no reasonable person would feel free to leave or otherwise decline an officer's request due to an officer's show of authority or use of physical force. *See State v. Young*, 135 Wn.2d 498, 512-13, 957 P.2d 681

---

[1] While five justices join the result to reverse Meredith's conviction, the concurrences do not fully join the lead opinion's reasoning. Instead, the concurrences would hold that law enforcement officers are not statutorily authorized to conduct fare enforcement and that reasonable suspicion was lacking to otherwise detain Meredith. *See* concurrence (Fearing, J. Pro Tem.) at 2 (finding Deputy Dalton lacked authority under RCW 36.57A.235 to seize Meredith without reasonable suspicion that Meredith committed a crime); concurrence (Madsen, J.) at 1 (concluding the same).

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(1998) (no seizure occurred when an officer shined a spotlight on a person walking on a public street considering "[n]o weapon was drawn" and "[t]he police car did not come screeching to a halt"); *O'Neill*, 148 Wn.2d at 579 (considering the public nature of the encounter and resulting "expectation of privacy" in determining whether a seizure occurred); *State v. Sum*, 199 Wn.2d 627, 649, 511 P.3d 92 (2022) ("[O]ur precedent requires courts to carefully assess 'all surrounding circumstances' that *are* presented in each encounter, rather than focusing on the circumstances that are *not* presented, or considering each encounter against a predetermined set of factors." (citing *Rankin*, 151 Wn.2d at 710)). The lead opinion recognizes that the "test 'is a purely objective one, looking to the actions of the law enforcement officer.'" Lead opinion at 11 (quoting *Young*, 135 Wn.2d at 501). And, it acknowledges that Deputy Dalton's request for proof of payment was not accompanied by any use or threat of physical force. *Id.*

In nonetheless concluding that Meredith was seized when Deputy Dalton asked for his proof of fare, the lead opinion emphasizes that he was on a moving bus and that Deputy Dalton and his partner were uniformed and at least one of them was armed. The lead opinion also concludes that Meredith would have felt compelled to comply with Deputy Dalton's request because, though the record shows the officer's tone was conversational, Clerk's Papers (CP) at 95-96, there is no indication that the

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

language he used—proof of payment or ORCA card—was phrased as a question. Lead opinion at 14-15. And, contrary to any established authority, the lead opinion asserts Meredith would have felt compelled to comply with Deputy Dalton's request because the encounter with a law enforcement officer could (and later did) result in an arrest. *Id.* at 15. As explained below, I believe the lead opinion's analysis minimizes the "show of authority" our precedent has consistently required for a seizure, placing too much emphasis on the bare fact that the fare enforcement function here was being carried out by law enforcement officers. The possible breadth of the lead opinion's analysis leaves too much uncertainty regarding whether and when police officers may perform noninvestigatory, governmental functions consistent with constitutional privacy protections.

I.     Whether a Seizure Occurs Must Focus on the Coercive Nature of the Police Conduct beyond the Fact That an Officer Is Armed and Uniformed

In concluding that Meredith was seized on the bus, the lead opinion places considerable weight on the fact that Deputy Dalton and his partner were law enforcement officers as opposed to civilian fare enforcement agents. While the lead opinion addresses additional circumstances, this central fact drives its conclusion that the circumstances of the encounter were coercive and that no reasonable person would have felt free to terminate the encounter or decline the request. *See* lead

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

opinion at 13 ("This 'threatening presence of several officers' further weighs in favor of holding that Meredith was seized" (internal quotation marks omitted) (quoting *Young*, 135 Wn.2d at 512)). This fact ultimately leads the lead opinion to partially invalidate the fare enforcement statute, RCW 36.57A.235. *Id.* at 25 (holding the statute unconstitutional as applied because it "authorize[d] a much greater level of intrusion than [was] reasonably necessary to further the governmental interest in fare enforcement on public transit"). The involvement of uniformed, armed officers therefore appears to be foundational to the lead opinion's conclusion that a violation of Meredith's right to privacy occurred.

Whether a law enforcement encounter amounts to a seizure is a legal question that we analyze "'in view of all the circumstances surrounding the incident.'" *Young*, 135 Wn.2d at 506 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980) (plurality portion)). But that we consider the entire context of an encounter does not mean all of the circumstances are given the same weight. Instead, we have explained that whether a person is seized under article I, section 7 depends on a reasonable person's view of the coercive aspects of the police officer's *actions*: "[w]hether a person has been restrained by a police officer must be determined based upon the *interaction* between the person and the officer." *O'Neill*, 148 Wn.2d at 575 (emphasis added). In this case, because no

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

physical force was used, the seizure analysis focuses on whether Deputy Dalton made a show of authority when he requested proof of fare payment that would cause a reasonable person to feel seized. *See id.* at 574.

The lead opinion points to very few actions by law enforcement to support its conclusion that a show of authority resulted in Meredith being seized on the bus. We know only that Deputy Dalton and his partner boarded the Swift bus at a station and, working from the back of the bus to the front, asked passengers including Meredith for proof of payment. CP at 106-07. The lead opinion notes that the bus was moving between stops during this time, so passengers could not immediately exit; and it infers from the phrasing of Deputy Dalton's statement—"[P]roof of payment or ORCA card"—that "no reasonable person in Meredith's position would believe that they were free to decline." Lead opinion at 15 (alteration in original) (quoting CP at 106).[2] Beyond this, the lead opinion relies almost entirely on the fact

---

[2] I question whether any appellate court is in a position to draw this inference from a cold record, particularly where the testimony was that Deputy Dalton's tone of voice in speaking to Meredith was "conversational." CP at 95-96. The lead opinion cites only a portion of the record relaying that Deputy Dalton "asked for proof of payment or an ORCA card." CP at 106. This statement is in response to the question "how do you ask for proof of payment" followed by Deputy Dalton's response: "Generally, what my wording is proof of payment or ORCA card." *Id.* There is nothing that tells us his voice inflection and whether this fragment of a sentence was phrased as a question. But given the question that Deputy Dalton was answering in his testimony ("how do you *ask* for proof of payment"), one could conclude that Deputy Dalton indeed framed the statement as a question. *See id.* at 329 (Finding of Fact 2) (Deputy Dalton and partner "asked passengers to present proof of fare payment or an Orca card."). Without more, I fail to see how the lead opinion

*State v. Meredith*, No. 100135-5
(Stephens, J., dissenting)

that Deputy Dalton and his partner were law enforcement officers acting in the course of their duties. *Id.* at 13 (describing Deputy Dalton and his partner as the "'threatening presence of several officers'" (internal quotation marks omitted) (quoting *Young*, 135 Wn.2d 512)).

Based on the record, I do not believe these facts support the conclusion that Meredith was "seized" for constitutional purposes on the bus. Our precedent recognizes that public encounters between individuals and armed, uniformed police officers do not necessarily implicate constitutional privacy concerns, as "'characterizing every street encounter between a citizen and the police as a 'seizure' . . . would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices.'" *Young*, 135 Wn.2d at 511 (quoting *Mendenhall*, 446 U.S. at 554 (plurality portion)). This is why we have stated that "police are permitted to engage persons in conversation and ask for identification even in the absence of an articulable suspicion of wrongdoing." *Id*. Indeed, this court has explicitly rejected the argument that an officer being armed and uniformed is a significant consideration in determining whether a seizure occurs:

> The reasonable person standard does not mean that when a uniformed law enforcement officer, with holstered weapon and official vehicle,

---

concludes "it is clear from the record that the deputy 'demand[ed] information'" from Meredith about whether he had paid his fare. Lead opinion at 15 (alteration in original) (internal quotation marks omitted); *see also* concurrence (Fearing, J. Pro Tem.) at 11 (concluding Deputy Dalton "demanded to see proof of payment").

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Meredith*, No. 100135-5
(Stephens, J., dissenting)

> approaches and asks questions, he has made such a show of authority as to rise to the level of a *Terry* stop. If that were true, then the vast majority of encounters between citizens and law enforcement officers would be seizures.

*O'Neill*, 148 Wn.2d at 581.

An encounter with armed and uniformed police officers is not a seizure in the absence of some additional coercive display of force or authority, such as in the examples of coercive police conduct from *Mendenhall* that have long guided our analysis. *See* lead opinion at 11 (*Mendenhall* provides "illustrative examples" when "assessing an officer's show of authority for purposes of article I, section 7"). All of those examples rely on specific actions a police officer takes beyond their armed and uniformed presence. For instance, one of the examples includes "the *display* of a weapon by an officer." *Mendenhall*, 446 U.S. at 554 (plurality portion) (emphasis added). In this case, the lead opinion finds only that "Deputy Dalton could have drawn his weapon at any time if he felt the need to do so." Lead opinion at 14. A significant difference exists between an officer displaying their weapon—which is clearly coercive—and the *possibility* that a weapon will be drawn—which is inherent to the officer being armed. Equating these two situations is inconsistent with our precedent, which allows an armed, uniformed officer to approach a person in public and request certain information without effectuating a seizure. *O'Neill*, 148 Wn.2d at 580; *Young*, 135 Wn.2d at 511; *State v. Armenta*, 134 Wn.2d 1, 11, 948 P.2d 1280

9

*State v. Meredith*, No. 100135-5
(Stephens, J., dissenting)

(1997) (concluding that a person is not seized when an officer requests their

identification in a public place).[3]

The fact that the encounter between Meredith and Deputy Dalton occurred on

a Swift bus is a relevant factor, which I address next. While Meredith's freedom of

movement was limited while on the bus, the totality of the circumstances, including

the context of barrier-free transit, strongly supports the conclusion that no seizure

occurred.

 II. In the Context of Barrier-Free Transit, a Request for Proof of Payment on a
 Public Bus Does Not Implicate a Person's Privacy Interests to the Same Extent
 as an Investigative Stop

In addition to the fact that Deputy Dalton and his partner were law

enforcement officers, the lead opinion concludes that a seizure occurred when

Deputy Dalton asked Meredith for proof of payment because the bus was moving

and therefore Meredith was not free to leave. While I recognize that a person's

---

[3] The lead opinion suggests our precedent has "already recognized the coercive effect that a weapon can have in a police encounter." Lead opinion at 14 (citing *Sum*, 199 Wn.2d at 644). But our analysis in *Sum* does not support this conclusion. In *Sum*, we reasoned race should matter in our seizure analysis in part because of "recent, well-publicized discrimination and violence by law enforcement directed at individuals of the same race or ethnicity as the allegedly seized person." 199 Wn.2d at 644. But our recognition that BIPOC (Black, Indigenous, People of Color) have a "'fear of how an officer with a gun will react to them'" helped explain why any reasonableness standard must consider a seized person's race or ethnicity. *Id.* (quoting *Utah v. Strieff*, 579 U.S. 232, 254, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016) (Sotomayor, J., dissenting)). *Sum* did not, as the lead opinion suggests, establish that the presence of a holstered weapon is a show of authority indicating a seizure. *See O'Neill*, 148 Wn.2d at 581.

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Meredith*, No. 100135-5
(Stephens, J., dissenting)

ability to terminate a police encounter in light of where the encounter occurs is a relevant consideration, the lead opinion fails to place Deputy Dalton's request for proof of fare within the context of barrier-free transit. Interpreted in that proper context, Deputy Dalton's contact with Meredith on the public bus is not the type of coercive police conduct that amounts to a seizure because it does not implicate the same privacy interests as an investigative stop.

That the Swift bus was moving between stops when the encounter took place should not distract us from the relevant consideration of whether Deputy Dalton's fare enforcement conduct itself was coercive. The United States Supreme Court has held under the Fourth Amendment that "[t]he fact that an encounter takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure." *United States v. Drayton*, 536 U.S. 194, 204, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002) (citing *Florida v. Bostick*, 501 U.S. 429, 441, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)). This is because a person's freedom to leave a bus, whether stationary or moving, is not necessarily related to the police officer's coercive conduct. *See State v. Thorn*, 129 Wn.2d 347, 353, 917 P.2d 108 (1996) (noting that "the focus of the inquiry is not on whether the defendant's movements are confined due to circumstances independent of police action, but on whether the police conduct was coercive"), *overruled on other grounds by O'Neill*, 148 Wn.2d

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

564. And, our inquiry does not end with the defendant's physical ability to leave. *Bostick*, 501 U.S. at 435 ("The state court erred, however, in focusing on whether Bostick was 'free to leave' rather than on the principle those words were intended to capture."). That is why "free to otherwise . . . terminate the encounter" is another component to our seizure analysis. *O'Neill*, 148 Wn.2d at 574.

The cases cited by the lead opinion actually support the idea that the place in which the encounter occurs must be taken together with coercive police conduct in order for a seizure to occur. For example, in *State v. Carriero*, 8 Wn. App. 2d 641, 659, 439 P.3d 679 (2019), the Court of Appeals held that a seizure occurred because the police used their patrol cars to block the defendant from leaving their car, not simply because the encounter took place in a narrow alley. The court concluded that "[c]ourts universally hold that law enforcement's blocking the exit of the accused's car constitutes a significant, if not a decisive, factor in finding a seizure." *Id.* at 660 (collecting cases). What mattered was the officer's affirmative conduct in blocking the exit.

Similarly, in *Dozier v. United States*, 220 A.3d 933, 941 (D.C. 2019), the District of Columbia Court of Appeals reasoned the fact the police encounter occurred in a secluded alley was relevant to the seizure analysis, also noting the alley was "partially blocked by a police cruiser with two additional officers standing by."

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

In addition to the coercive police action, the secluded location was relevant because the defendant was alone where "no passersby could see into the alley unless they were right at the entrance of one end or the other." *Id.* at 942. This mattered because "an encounter is 'more intimidating if the person is by himself, if more than one officer is present, or if the encounter occurs in a location that is secluded or out of public sight.'" *Id.* (quoting *Jones v. United States*, 154 A.3d 591, 597 (D.C. 2017)). In both cases, law enforcement engaged in coercive conduct in a place obscured from public view and restricted the defendant's movement, beyond limitations resulting from the specific place in which the encounter occurred.

I recognize that most of the above cited cases were decided under the Fourth Amendment while article I, section 7 is more protective. *Harrington*, 167 Wn.2d at 663. But under article I, section 7, the focus remains on police conduct, and this court has recognized that encounters between law enforcement and individuals in a public place involve unique considerations of privacy interests that guide the analysis of whether a seizure occurs. For example, in *O'Neill*, this court concluded a seizure did not occur under article I, section 7 when an officer approached a vehicle parked in a public place and asked the passenger for identification. 148 Wn.2d at 574-80. The court emphasized the limited privacy interests at issue: "[t]he occupant of a car does not have the same expectation of privacy in a vehicle parked in a public

*State v. Meredith*, No. 100135-5
(Stephens, J., dissenting)

place as he or she might have in a vehicle in a private location—he or she is visible and accessible to anyone approaching." *Id*. at 579. This context supported the court's holding "that no unreasonable intrusion by police occurs when an officer approaches the driver of an automobile parked in a public parking lot and engages him or her in conversation." *Id.*

In *Rankin* we similarly considered whether a police officer's request for identification from a passenger occurring *after* a car was lawfully stopped constituted a seizure. We noted that "'"many [individuals] find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel."'" *Rankin*, 151 Wn.2d at 697 (alteration in original) (quoting *City of Seattle v. Mesiani*, 110 Wn.2d 454, 457, 755 P.2d 775 (1988) (quoting *Delaware v. Prouse*, 440 U.S. 648, 662, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979))). The encounter in *Rankin* was also investigatory in nature: upon stopping the car for a traffic infraction, the officer recognized James Rankin as someone he had arrested a month earlier. *Id*. at 692. This court held that a "request for identification from a passenger *for investigatory purposes* constitutes a seizure unless there is a reasonable basis for the inquiry." *Id*. at 697 (emphasis added). In that case, given that the context of the vehicle stop was to conduct a law enforcement

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

investigation, the court held a seizure had occurred when the officer asked for identification. *Id.* at 699.

The lead opinion fails to discuss how these cases impact its seizure analysis. Each case shows that the setting in which an encounter occurs can alter an individual's expectation of being left undisturbed. Deputy Dalton's request for Meredith's bus fare is more akin to the situation involved in *O'Neill* than in *Rankin*. Meredith's encounter with Deputy Dalton occurred on a transit bus—clearly a public setting. *O'Neill*, 148 Wn.2d at 579; *cf. Dozier*, 220 A.3d at 942. In addition to the public nature of the encounter, we must assume Meredith knew that proof of payment could be requested and that he could be cited and ejected from the bus for failure to provide payment because that is the nature of barrier-free transit. RCW 36.57A.235(2)(b)(i), (iii). For over a century we have recognized that that "it is incumbent upon the [passenger] to produce a ticket showing his right to transportation, when called upon . . . or pay the fare in money, or peaceably leave." *Loy v. N. Pac. Ry. Co.*, 68 Wash. 33, 39, 122 P. 372 (1912). Indeed, the lead opinion acknowledges that a rider on a barrier-free bus may consent to showing proof of fare: "a reasonable person should know that they might be asked to provide proof of payment while traveling on a barrier-free transit system." Lead opinion at 29; *see also id.* at 27 (recognizing that no seizure occurs when an encounter is consensual).

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Meredith*, No. 100135-5
(Stephens, J., dissenting)

This begs an important question the lead opinion overlooks: Would a reasonable transit passenger not feel free to terminate an encounter because they know they must provide proof of payment or was it the enforcement officer's conduct that made it impossible to terminate the encounter?[4]

Fare enforcement in the context of barrier-free transit is unlike a law enforcement investigatory stop of a private vehicle, as in *Rankin*. Approaching a bus rider for proof of fare has never been regarded as akin to an investigatory vehicle stop, and there is no indication Deputy Dalton requested Meredith's proof of payment to investigate criminal activity. *See Loy*, 68 Wash. at 39. RCW 36.57A.235(2)(b)(i) authorizes only the request for proof of payment, and Deputy Dalton's initial contact with Meredith on the bus is the conduct the lead opinion and Justice Pro Tempore Fearing conclude is a seizure. The statute confirms that a

---

[4] The lead opinion attempts to parse the question of consent, concluding that while a passenger on a barrier-free bus consents to being asked for proof of fare, this consent does not extend to being approached by armed, uniformed police officers. Lead opinion at 29-30. But whether the presence of police officers transforms a fare enforcement contact into a seizure goes to the ultimate question before us. By starting from this premise, the lead opinion appears to presuppose its own conclusion that fare enforcement cannot constitutionally be performed by such officers. *See id.* at 19-20 ("[T]he statute [RCW 36.57A.235] purported to authorize Deputy Dalton (an armed, uniformed police officer) to disturb the private affairs of Meredith (a passenger on a public bus traveling between stops) for purposes of fare enforcement, despite having no reason to suspect Meredith had not paid."). The analysis should instead start by recognizing that barrier-free bus riders have a diminished expectation of being left undisturbed while riding the bus and then proceed to considering whether there was a show of force or coercion during the encounter that resulted in a seizure.

16

*State v. Meredith*, No. 100135-5
(Stephens, J., dissenting)

request for fare is not investigatory in itself, as a fare enforcement officer may ask

for an identification of a bus passenger *only when* they do not produce proof of

payment. RCW 36.57A.235(2)(b)(ii). The request for payment from passengers on

the moving bus is meant to ensure that passengers are paying their bus fare, not to

investigate any criminal activity. For this reason, in this sense, it is difficult to see

how asking for proof of fare on a barrier-free bus implicates one's private affairs in

the same way that asking for identification in a context like *Rankin* does.

In concluding that RCW 36.57A.235(2)(a) impermissibly grants police

officers unconstrained authority, the lead opinion must rely on facts that occurred

*after* the encounter on the bus that Meredith argues constituted a seizure. For

example, the fact that officers later "identified and arrested him using resources that

no civilian conducting fare enforcement could have accessed" is a significant factor

for the lead opinion. Lead opinion at 23. The lead opinion's reliance on the

escalation of the encounter and the officers' conduct with Meredith after the alleged

seizure on the bus occurred causes its analysis to drift from the question of whether

a seizure occurred on the bus in the first place. Because "the 'reasonable person'

test presupposes an *innocent* person," the possible escalation of a police encounter

as events unfold is not relevant to whether a seizure occurred. *Bostick*, 501 U.S. at

438. This possibility exists in any encounter with law enforcement, and the lead

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

opinion fails to persuasively explain why this escalation should matter in the context of barrier-free transit, but not during a street encounter. *See Young*, 135 Wn.2d at 511 ("'[C]haracterizing every street encounter between a citizen and the police as a "seizure" . . . would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices.'" (quoting *Mendenhall*, 446 U.S. at 554 (plurality portion)). Viewed through the proper lens, Deputy Dalton's check for payment was not an investigatory seizure similar to the seizure that may occur in a traffic stop of a vehicle. *See State v. Marchand*, 104 Wn.2d 434, 437, 706 P.2d 225 (1985) (accepting as a starting premise that the vehicle stop constituted a seizure under the Fourth Amendment); *Mesiani*, 110 Wn.2d at 458 (sobriety checkpoints are "a seizure to discover evidence of [a] crime[]" and are highly intrusive).

I agree with the lead opinion that if law enforcement officers confront a passenger in a coercive manner and forcefully demand proof of payment under circumstances that would leave a reasonable person with no option to terminate the encounter, this would constitute a seizure implicating privacy rights under article I, section 7. *See O'Neill,* 148 Wn.2d at 577 ("'Where an officer commands a person to halt or demands information from the person, a seizure occurs.'" (quoting *State v. Cormier*, 100 Wn. App. 457, 460-61, 997 P.2d 950 (2000)). But I disagree that the facts before us establish such a seizure. The record does not support the conclusion

*State v. Meredith*, No. 100135-5
(Stephens, J., dissenting)

that Deputy Dalton engaged in forceful or coercive conduct when he contacted Meredith on the bus, and his request for payment must be viewed in the context of barrier-free transit where passengers reasonably expect to be asked for proof of payment en route. By focusing almost exclusively on the fact that Deputy Dalton and his partner were law enforcement officers, the lead opinion expands notions of force and coercion beyond what our precedent supports and broadly suggests encounters with law enforcement officers are inherently coercive. This all but invalidates the fare enforcement statute on its face. In the absence of evidence of law enforcement actions amounting to a show of force or coercive authority, the fact that uniformed, armed law enforcement officers perform a statutorily authorized fare enforcement function does not establish a seizure that encroaches on constitutional privacy rights.

CONCLUSION

I worry that the lead opinion's analysis may call into question the extent law enforcement officers can conduct noninvestigatory government functions consistent with the constitutional rights of the individuals they encounter. Given the context of statutorily authorized fare enforcement on barrier-free transit, which sets the stage for analyzing the privacy interests at issue, whether a seizure occurs must turn on proof that law enforcement officers engaged in forceful or coercive conduct in their

19

*State v. Meredith*, No. 100135-5
(Stephens, J., dissenting)

engagement with bus riders. In this case, five members of the court agree that Meredith was not seized when Deputy Dalton approached him on the bus, though Justice Madsen concurs in the decision to reverse his conviction on the ground that law enforcement officers are not authorized to conduct fare enforcement under RCW 36.57A.235. While I agree with the lead opinion that fare enforcement by law enforcement officers is statutorily authorized, I respectfully dissent because I conclude, based on the facts before us, that Meredith was not seized when Deputy Dalton approached him for proof of fare payment and his privacy rights under article I, section 7 were therefore not violated.

_____
Stephens, J.

_____
Johnson, J.

_____
Owens, J.

_____
Whitener, J.